## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| F.F., *a minor, by and through her next friend and father, JAMES ELLARD FISHER, individually and on behalf of all others similarly situated,* | ) ) ) | |
| | ) | Case No. 1:25-cv-09112 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| VALLEY VIEW COMMUNITY UNIT SCHOOL DISTRICT 365U, | ) ) | |
| Defendant. | | |

### MEMORANDUM OPINION AND ORDER

James Ellard Fisher ("Mr. Fisher"), on behalf of his minor daughter, F.F. ("Plaintiff"), and all others similarly situated, brings a two-count Complaint against Defendant, Valley View Community Unit School District 365U ("Defendant" or "School"), alleging Defendant violated: (1) the Equal Protection Clause of the Fourteenth Amendment and (2) Title IX of the Education Amendments of 1972 by and through its policy of allowing transgender female students access to "female-only" spaces, including restrooms, locker rooms, changing rooms, and showers, without any "objective assessment" of gender dysphoria or "subjective manifestation" of female identity. Plaintiff seeks entry of a preliminary injunction ("PI") enjoining Defendant from enforcing their policy based solely on transgender students' self-declared gender preferences, instead of offering them single-use gender-neutral facilities as a less intrusive alternative. After considering the parties' briefing and their oral arguments held on September 17, 2025, the Court denies Plaintiff's PI Motion ("Motion")[12], for the reasons set forth herein.

## BACKGROUND

Plaintiff is a 17-year-old female student enrolled at Bolingbrook High School. On November 4, 2024, at around 10:00 a.m., Plaintiff entered a girls' multi-use restroom labeled "girls' bathroom." After using and exiting a stall, Plaintiff observed a transgender student, who she was familiar with, dressed in "male-typical clothing…with no visible indication of female identity," standing in close proximity to her stall. Plaintiff feared that the student could have seen her undergarments or her exposed body while she was disrobed through small spaces on either side or under the stall door. While Plaintiff does not allege any facts indicating the student actually saw or tried to see her exposed body, Plaintiff claims to have been "triggered" and to have experienced "intense feelings of anxiety, discomfort, and shame" from the mere possibility of being exposed.

On November 6, 2024, Plaintiff described the incident to her father, Mr. Fisher. The following day, Mr. Fisher sent a text message to the School's principal, Dr. Pascavage, to report the incident and raise concerns about Plaintiff's privacy. Dr. Pascavage responded that the transgender female student had been granted access to the girls' restroom pursuant to an Individual Development Plan, or formal plan outlining the student's gender-identity accommodations. To address Plaintiff's privacy concerns, Dr. Pascavage offered Plaintiff access to single-use staff restrooms.

During an in-person meeting with Mr. Fisher on November 12, 2024, Dr. Pascavage further elaborated that the School followed Illinois Department of Human Rights ("IDHR") guidance, titled "Guidance on Protection of Students in Illinois: A Non- Regulatory Guidance Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students.[1]" The 2021 IDHR publication

---

[1] Illinois Department of Human Rights, "Non- Regulatory Guidance Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act," https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/idhr-guidance-relating-toprotection-of-transgender-nonbinary-and-gender-nonconforming-students-eng-web.pdf (last visited September 30, 2025).

provides guidelines on complying with the Illinois Human Rights Act, 775 ILCS 5/5-101 et seq. ("IHRA"), "in the context of a school setting, with specific focus on how the IHRA protects the rights of transgender, nonbinary, and gender nonconforming individuals." In relevant part, the publication states:

> Use of restrooms, locker rooms and changing rooms may not be restricted based upon a student's physical anatomy or chromosomal sex. A student must be permitted to access restrooms or bathrooms, locker rooms and changing rooms that align with their gender-related identity and **_without having to provide documentation or other proof of gender._**
>
> Under the Act, the discomfort or privacy concerns of other students, teachers, or parents are not valid reasons to deny or limit the full and equal use of facilities based on a student's gender-related identity. Instead, any student, teacher or other individual **_seeking more privacy should be accommodated by providing that individual a more private option upon their request, if possible._** The prejudices of others are part of what the [Act] was meant to prevent. [T]here is no right that insulates a student from coming in contact with others who are different.

*Id.* at 6-7 (emphasis added). During continued communication with Dr. Pascavage throughout November 2024, Mr. Fisher expressed frustration with the School's policy and complained that the School's offer to allow Plaintiff's use of an alternative facility, would not sufficiently address the issue.

On December 9, 2024, at a public meeting of the School District's Board of Education, Mr. Fisher raised the issue of transgender students having access to the girls' restrooms, drawing attention to gaps on the sides and below stall doors that render the interior of the stall partially visible from outside. In response to Mr. Fisher's concerns about the stall design, between December 20, 2024, and January 6, 2025, the School installed rubber strips and other opaque material on the toilet stalls in the girls' restrooms.

In January 2025, Plaintiff attempted to use the staff restroom in the School's library to avoid running into a transgender student in a girls' restroom. Plaintiff alleges, however, that she was denied access to the staff restroom by the librarian. Discouraged, Plaintiff took deliberate care to use other girls' restrooms in the School as far away as possible from the one where the initial "incident"

occurred.  Further, Plaintiff used these girls' restrooms only during class hours, which she alleges led to her losing classroom instruction time, disrupted her routine, heightened her unease, and diminished her sense of safety at the School.  She further claims that this fear caused her to skip restroom visits, which Plaintiff states was "especially unsettling" during the days she had her period.  Plaintiff does not allege, however, that she confirmed or investigated the gender identity of any other girls she encountered in the restroom outside of the transgender girl she was familiar with from the initial "incident."

In response to Plaintiff's distress, on March 20, 2025, Mr. Fisher filed a formal Title IX complaint with the School District's Title IX Coordinator, Sarah DeDonato.  The complaint alleged that due to Plaintiff's encounter with a transgender female student in a girls' restroom, Plaintiff was discriminated against and harassed based on her sex.  On June 23, 2025, Dr. Teresa Polson, the School District's Assistant Superintendent for Educational Services, sent Mr. Fisher a final decision letter via certified mail and email, rejecting Plaintiff's Title IX complaint, again citing the IDHR's guidance regarding the rights of transgender, nonbinary, and gender nonconforming individuals in a school setting and further stating that the privacy concerns articulated by Plaintiff were "purely speculative and not based on fact."

Dissatisfied with the outcome of her Title IX complaint, Plaintiff filed the present action on August 1, 2025, followed by a motion for a temporary restraining order ("TRO") and PI (Dkt. 12).  On August 13, 2025, the Court denied the TRO (Dkt. 13), stating that "Plaintiff's representations in her motion do not demonstrate that Plaintiff is under threat of such immediate harm necessitating extraordinary relief through issuance of a temporary restraining order" and setting a briefing schedule for Plaintiff's PI Motion.  The Motion is now fully briefed before this Court.

**LEGAL STANDARD**

The standards for issuing a TRO are identical to those for a PI. *Gray v. Orr*, 4 F. Supp.3d 984, 989 n.2 (N.D. Ill. 2013) (Durkin, T.). Both are "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (citation omitted). A party seeking a PI must first demonstrate: (1) likelihood of success on the merits; (2) that irreparable harm is likely in the absence of the PI; and (3) that there is no adequate remedy at law. *See Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *Cassell*, 990 F.3d at 544-45. If the moving party fails to demonstrate any one of these three threshold requirements, the Court must deny the motion. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Even if the moving party makes this threshold showing, the Court then exercises considerable discretion in balancing the harm between the parties and the effect on the public interest in determining the motion. *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020); *Cassell*, 990 F.3d at 545.

**DISCUSSION**

    A. <u>Likelihood of Success on the Merits</u>

        *1. Equal Protection Claim*

Plaintiff asserts that the Defendant's policy, which accommodates transgender female students in multi-use sex-segregated spaces discriminates against "female" students because it denies them the use of secure sex-segregated spaces free from intrusion by "males." (Dkt. 12 at *4). For a showing of likelihood of success on the merits, a plaintiff must show more than a "mere possibility of success." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Rather, a plaintiff must make a strong showing that they will likely succeed on the merits of their claims. *See id.* Plaintiff has failed to make any such showing.

The Equal Protection Clause ("Clause") mandates that individuals in similar circumstances be treated equally. *City of Cleburne v. Cleburne Living Ctr.*, 105 S.Ct. 3249, 3254 (1985). The Clause prohibits

intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 120 S.Ct. 1073, 1075 (2000) (per curiam). Typically, state actions are presumed valid and upheld if the classification is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 3254. This rational-basis standard, however, does not apply to sex-based classifications. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017). Instead, for a sex-based classification, the state bears the burden of proving an "exceedingly persuasive" justification, must demonstrate that the classification advances important governmental objectives, and that the discriminatory methods are substantially related to achieving those objectives. *United States v. Virginia*, 116 S.Ct. 2264, 2275 (1996).

Plaintiff argues that Defendant's policy to accommodate transgender female students in spaces previously reserved for the exclusive use of "female" students, qualifies as sex-based discrimination. (*See* Dkt. 12 at *4). Plaintiff also argues that Defendant's policy disproportionately harms "female" students, who must "endure privacy violations or seek burdensome alternatives, such as staff restrooms, thereby disrupting their education." (*See id.* at *7). Plaintiff concludes that Defendant's policy fails heightened scrutiny, since it offers no important governmental objective for allowing transgender female students access to "female" spaces without evidence of female gender identity and any basis in a recognized social or biological construct of sex. (*See id.* at *7-8).

Defendant, however, asserts that its policy does not include a sex-based classification and notes that, as pled by Plaintiff, the framework for Defendant's restroom access comes directly from the IDHR' gender-neutral guidance that "[a] student must be permitted to access restrooms or bathrooms, locker rooms and changing rooms that align with their gender related identity [...]. (*See* Dkt. 22 at *6). Defendant also argues Plaintiff's contention, that female students are disproportionately hurt by this guidance, is unpersuasive as it is clear that all students are allowed access to the restroom that aligns with their gender identity. (*Id.*). Importantly, Defendant asserts all students, Plaintiff included, are allowed access to the restroom that aligns with their gender identity,

not just transgender women—any other interpretation would ignore the fact that transgender men, cisgender men, and cisgender women are all guaranteed the same accommodations as transgender women. (*Id.*).

The Court agrees with Defendant that its policy does not constitute sex-based discrimination like the policies deemed unconstitutional by the Seventh Circuit in *Whitaker* and *Martinsville* because *ALL* students, regardless of gender, are permitted access to facilities that align with their gender identity. Plaintiff's reliance on *Whitaker* and *Martinsville* is erroneous, as those cases, which required students to use the gender-specific restroom matching their birth certificate, included sex-based classifications regarding transgender students, and treated transgender students who failed to conform to the sex-based stereotypes, differently on the basis of their transgender status. *See generally Whitaker*, 858 F.3d 1034; *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023). Here, Defendant's existing policy is gender neutral and does not treat transgender students differently on the basis of their transgender status. Defendant allows every student, regardless of gender, to utilize the facility consistent with their gender identity, and, importantly, does not include any sex-based classification that triggers the heightened scrutiny analysis found in *Whitaker* and *Martinsville.*

Perplexingly, Plaintiff asks this Court to enter an order that resembles the policies already found to be unconstitutional in *Whitaker* and *Martinsville* by requiring Defendant to adopt a policy based on "objective criteria" like medical documentation and gender identity that would explicitly result in the disparate treatment of transgender students. Any policy based on medical documentation of biological gender would run afoul to the rulings in *Whitaker* and *Martinsville* and any policy requiring medical documentation of gender identity would be contrary to the IDHR's guidance, which states that all students *MUST* be permitted access to facilities that align with their gender-related identity "without having to provide documentation or other proof of gender." IDHR, *supra* note 1 at 7. As Defendant emphasizes, Plaintiff fails to acknowledge that Defendant's policy is inclusive of all

7

genders, which contrasts the exclusive policies in *Whitaker* and *Martinsville* that included sex-based disparate treatment of transgender students and were found unconstitutional by the Seventh Circuit.

While *Whitaker* and *Martinsville* are still binding authority on this Court, the Court acknowledges that the recent Supreme Court opinion in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), has caused the Seventh Circuit to reconsider their holdings in those cases. In *Skrmetti* the Supreme Court found that a Tennessee law ("SB1") prohibiting certain medical treatments for transgender minors was not subject to heightened scrutiny because the law did not prohibit conduct for one sex that it permits for the other. *Id.* at 1831. Under SB1, no minor can be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence and minors of any sex can be administered puberty blockers or hormones for other purposes. *Id.* Here, Defendant's policy, similarly, does not prohibit conduct for one sex, namely the use of specific restrooms, that it permits for other since *ALL* students are permitted to use the restroom that aligns with their gender identity.

Furthermore, even if this new precedent calls into question whether policies that target and disproportionally affect transgender students are still subject to intermediate scrutiny, the outcome of the likelihood of success on the merits analysis remains the same since Defendant's inclusive policy does not prohibit conduct for one sex that it permits for the others. Importantly, even if it did, it would be given even more deference under rational basis review. The relaxed rational basis inquiry requires a court to uphold a statutory classification so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 113 S.Ct. 2096, 2101 (1993). Where there exist "plausible reasons" for the relevant government action, "our inquiry is at an end." *Id.*; *Skrmetti,* 145 S. Ct. at 1835.

Defendant's inclusive policy—which is consistent with State and Federal law, allows transgender students access to the restrooms aligning with their gender identity, and provides

alternative facilities for individuals with privacy concerns—is definitively gender neutral and easily overcomes rational basis inquiry if not.[2] For these reasons, the Seventh Circuit's rehearing of *Whitaker* and *Martinsville*, in light of *Skrmetti*, does not affect this Court's ruling.

Ultimately, because Defendant's policy is gender neutral as to all students, Plaintiff's Equal Protection claim is unlikely to succeed on the merits.

### 2. *Title IX Claim*

The Court now moves to Plaintiff's Title IX Claim. Plaintiff argues Defendant intentionally discriminates against "female students" by subjecting them to the constant risk of encountering transgender female students in "female-only" spaces, causing anxiety, humiliation, and educational disruption. (*See* Dkt. 12 at *9). Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance [...]" 20 U.S.C. § 1681(a). Plaintiff, again, fails to make a showing that Defendant engaged in discrimination on the basis of sex.

Plaintiff argues the Seventh Circuit's rulings in *Whitaker* and *Martinsville*—where transgender students were discriminated against by their respective schools' policies that deny them access to facilities matching their gender identity—apply inversely here: Plaintiff and the proposed class face discrimination because Defendant's policy forces them to share facilities with "biological males" based solely on self-declared preferences and without objective criteria like medical documentation and gender identity. (*See* Dkt. 12 at *10). Plaintiff further argues that, unlike the transgender students in *Whitaker* and *Martinsville*, who provided medical record evidence and consistent gender expression, the

---

[2] *Contrast Romer v. Evans*, 116 S. Ct. 1620, 1623 (1996)(where the "sheer breadth" of an exclusionary law which makes a general announcement that gays and lesbians shall not have any particular protections from the law was "so discontinuous with the reasons offered for it that the [law] seem[ed] inexplicable by anything but animus toward the class it affect[ed]").

student Plaintiff encountered in the girls' restroom, in her subjective opinion, exhibited no signs of female gender acknowledgement or expression. (*Id.*).

By contrast, Defendant argues Plaintiff's claim fails for multiple reasons. First, because Plaintiff fails to show that Defendant's inclusive policy leads to disparate treatment, she cannot prove she is subjected to any sex-based discrimination. (Dkt. 22 at *7). Second, because Plaintiff's Title IX theory is not focused on her own access to the restroom, but instead focuses on the proposed exclusion of transgender female students from facilities based on "privacy concerns," her theory should be rejected like the Seventh Circuit's rejections of such "conjectural" "privacy concerns" in both *Whitaker* and *Martinsville*. (*Id.* at *8). And third, Plaintiff's argument that the use of medical records in *Whitaker* and *Martinsville* created a method for how students should prove their gender misconstrues the rulings of these cases as the medical records were offered to support each plaintiff's preliminary injunction motion based on their medically documented diminished well-being in response to the respective schools' policies, not to prove their gender. (*See Id.* at *8).

The Court agrees with Defendant that Plaintiff has not shown that Defendant's policy violates Title IX since its policy guarantees all students equal rights provided under the statute. The Seventh Circuit has held that policies denying students access to facilities consistent with their gender identity can constitute sex-based discrimination under Title IX, particularly when such policies rely on sex-stereotyping or failing to account for a student's transgender status. *Whitaker*, 858 F.3d at 1048–50; *Martinsville*, 75 F.4th at 769–70. Specifically, the Seventh Circuit in *Martinsville* determined that a bathroom policy relying on biological sex to address "privacy concerns" for cisgender students, violates Title IX because a transgender students' presence in their gender affirming bathroom "did not threaten those privacy interests" and because "gender-affirming access policies neither thwart rule enforcement nor increase the risk of misbehavior in bathrooms and locker rooms." *See Martinsville*, 75 F.4th at 773-774.

10

Applying these cases inversely and allowing for disparate gender identification policies, would lead to the exact unconstitutional scenario the Seventh Circuit rebuked in both *Whitaker* and *Martinsville*: a ban on transgender students' access to restrooms that align with their gender identity. Plaintiff's desire to improperly rely on sex stereotyping, is evidenced by her Counsel's oral argument suggesting the transgender student's wearing of "male clothing," or baggy clothes, "obviously" meant she could not identify as female—despite baggy clothes being a common style worn by teenagers across all genders. Plaintiff's claim does not allege that she faced disparate treatment. Instead, Plaintiff asks this Court to enter an order that disparately treats all transgender students based on a singular, speculative conclusion that the student she encountered in the bathroom is not female. Doing so would be wholly contrary to precedent. Accordingly, Plaintiff cannot show a likelihood of success on her Title IX Claim.

### B. Showing of Irreparable Harm

Next the Court will evaluate Plaintiff's assertion that she will face irreparable harm absent injunctive relief for both of her claims. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787 (7th Cir. 2011). Plaintiff argues that she has met this burden by asserting that she and the proposed class suffer continuous harm from Defendant's policy which forces them to navigate restrooms with compromised privacy, leading to unease, embarrassment, anguish, and interference with learning. (Dkt. 12 at *10-11).

A showing of irreparable harm requires more than a mere possibility of harm. *Michigan*, 667 F.3d 765 at 788. Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts*, 549 F.3d at 1089. In determining whether irreparable harm is satisfied, plaintiffs must show that no adequate legal remedy is available to cure the harm. *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*

11

Plaintiff argues that her reported anxiety and forced bathroom behavioral changes mirror the harm deemed irreparable in *Whitaker* and *Martinsville* and argues Defendant's inadequate modifications to restroom stalls and its refusal to restrict transgender female students from accessing "female" facilities, guarantee that this harm remains significant and ongoing. (Dkt. 11 at *7). Plaintiff concedes, however, that in *Martinsville*, the Seventh Circuit rejected the school district's privacy-based justification for denying gender-affirming facility access, finding them "entirely conjectural." (*Id.* at *11).

This Court does not believe the harm Plaintiff articulates rises to the level of irreparable harm outlined in *Whitaker* and *Martinsville*. Plaintiff's fears are not based on any stigmatization stemming from gender dysphoria or additional attention that comes from being othered. *Contrast Martinsville,* 75 F.4th 760 at 764, 767(where plaintiff described that being excluded from the boys' restrooms worsened the "significant distress, depression, and anxiety" caused by his gender dysphoria and that "using the remote unisex bathroom drew undesirable attention to his transgender status."). Plaintiff also does not allege suicidal ideation and diminished wellbeing from Defendant's exclusionary treatment or make a clear showing that the alternative bathrooms Defendant provided were located far from her classrooms like the plaintiff in *Whitaker* alleged. *Contrast Whitaker*, 858 F.3d at 1045 (where plaintiff described "thoughts of suicide" in response to his school's exclusionary policies and where the "record demonstrate[d] that [alternative] bathrooms were not located close to [plaintiff's] classrooms."). Instead, Plaintiff's fear of harm from merely encountering a transgender student in the classroom, is similar to the "entirely conjectural" reasoning rejected in *Martinsville. See Martinsville*, 75 F.4th at 772–73. Her reported distress is particularly suspect as it relies on Plaintiff's subjective determination that a transgender female student did not meet the gender stereotypes of a girl and that her presence in the bathroom, without incident, created an inherent privacy concern.

12

Nonetheless, despite the insufficient nature of Plaintiff's alleged privacy concerns, Defendant has taken great care to address Plaintiff's concerns. Specifically, notwithstanding the complete lack of requirement that Defendant take any action whatsoever, the School added blinders to the restroom stall doors to reduce the amount of visible space between the door and the stall and offered the student access to numerous private restrooms, always within 100 feet of her classrooms. Defendant's offerings were in accordance with IDHR guidance, which states any student, teacher or other individual "seeking more privacy should be accommodated by providing that individual a more private option upon their request, if possible," even though "there is no right that insulates a student from coming in contact with others who are different." IDHR, *supra* note 1 at 7. Defendant's accommodation of a private bathroom went beyond what Defendant is required by law to provide. Finally, unlike the plaintiffs in *Whitaker* and *Martinsville*, Plaintiff has not provided proof of diminished well-being in support of her allegations, further solidifying that she cannot make a showing that she will suffer irreparable harm absent her requested relief. To find irreparable harm based on one individual's singular, speculative opinion could result is very dangerous precedent, especially where Plaintiff failed to allege actual, substantive facts to support her conclusion that the individual was not transgender, other than reference her "male clothing."

C.  Alternative Remedies Available to Plaintiff

The final consideration in the threshold analysis is to determine whether adequate remedies at law exist in absence of the requested relief. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). This requires a showing that any award would be "seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Plaintiff argues "[t]he resulting psychological and educational toll [of feeling like she does not have privacy in the sex-specific female restroom] constitutes irreparable injury, [and states that] monetary damages cannot restore lost privacy, safety, or educational opportunities." (Dkt. 12 at *11).

13

As outlined above in the Court's ruling on irreparable harm, this Court does not believe Plaintiff has established that her alleged harm, undiagnosed anxiety, cannot be remedied through other means. This type of alleged, undocumented emotional distress does not rise to the level of the harm pled by a transgender student in *Whitaker,* which involved claims of possible suicide and life-long diminished well-being and functioning, where the Seventh Circuit found that such harm could not be remedied by monetary damages. *See Whitaker*, 858 F.3d at 1046. Because Plaintiff has not demonstrated that her undiagnosed emotional condition cannot be remedied through alternative means, or that her privacy concerns cannot be remedied by the modifications already offered by Defendant, or by way of access to private facilities, Plaintiff fails to show that no adequate remedies at law exist.

### D.  Balance of Equities and the Public Interest

Finally, the Court considers the balance of equities between the parties and the effect on the public interest. Before ruling on an injunction request, courts are required to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 377 (2008). This includes "particular regard for the public consequences" should the preliminary injunction be issued. *Id.* This analysis is a "subjective and intuitive one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group*, Inc., 237 F. 3d 891, 896 (7th Cir. 2001).

Plaintiff argues the balance of equities strongly favor Plaintiff since Defendant's policy inflicts significant harm on female students by compromising their privacy and safety. (Dkt. 12 at *12). Plaintiff similarly argues that an injunction would serve the public interest since Defendant's policy undermines the public's interest in safe and equitable educational environments, particularly for female students facing discrimination. (*Id.* at *13). Plaintiff further asserts that the non-regulatory guidance

14

from the IDHR that Defendant relies upon in developing its gender-affirming policy, lacks the force of law, and even if it did have the force of law, should be considered presumptively invalid. (*Id.* at *14). Plaintiff ultimately argues the balance of equities weigh in her favor because Defendant would face "minimal hardship" implementing single-use gender-neutral facilities for transgenders students. (*See* Dkt. 12 at *12). Plaintiff does not address, however, the hardship Defendant would face, or the privacy violations transgender students would face, if Defendant were forced to confirm students' biological sex and genitalia based on onlookers' subjective determinations that an individual does not have the "correct" gender identity to be in a specific sex segregated space.

By contrast, Defendant contends the balance of equity weighs in its favor because the injunctive relief Plaintiff requests the Court to endorse is the exact scheme that has regularly been found unconstitutional; such a ruling would expose Defendant to legitimate lawsuits from every transgender student wishing to use the restroom best aligned with their respective gender identity, which, in and of itself, places the balance of equities in favor of Defendant. (Dkt. 22 at *12). Defendant similarly argues the public interest is best served by allowing it to continue complying with IDHR guidance during the pendency of this litigation to avoid an influx of administrative complaints and lawsuits that would ensue from adopting Plaintiff's proposed policy, that has already been found unconstitutional by the Seventh Circuit. (*Id.* at 18).

At this stage, it is clear the balance of equities and public interest weigh in favor of Defendant's position. Relevant here, *Whitaker* emphasizes that that hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have not materialized, and, importantly, that adopting an inclusive policy that allows transgender students to use facilities that align with their gender identity best serves the needs of students. *Whitaker*, 858 F.3d at 1055. While the Seventh Circuit in *Martinsville* acknowledged the importance of individual privacy interest to the public, it determined a that a transgender student's use of a facility consistent with their gender

15

identity does not threaten those privacy interests. *Martinsville*, 75 F.4th at 774. Such principles apply here. Defendant's policy should not be displaced since it complies with state and federal guidance, best serves the needs of students, and does not create privacy concerns—especially where the alleged evidence of harm caused by the transgender student at issue is wholly unsupported. *See id.* (stating that plaintiff's claims of harm were unsupported when students were granted gender-affirming accommodations without incident over the course of a year).

The balance of equities and public interest are best served by denying the Motion.

**CONCLUSION**

Accordingly, the Court denies Plaintiff's Motion for a Preliminary Injunction [12].

IT IS SO ORDERED.

Date: 9/30/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge